UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUIS ROTKOWITZ, Derivatively on Behalf of RIOT BLOCKCHAIN, INC., | Case No. |
| Plaintiff, | |
| | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| v. | |
| JOHN R. O'ROURKE, MICHAEL M. BEEGHLEY, JEFFREY G. MCGONEGAL, BARRY HONIG, ANDREW J. KAPLAN, JASON LES, and ERIC SO, | |
| Defendants, | |
| -and- | |
| RIOT BLOCKCHAIN, INC., a Nevada corporation, | |
| | DEMAND FOR JURY TRIAL |
| Nominal Defendant. | |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Riot Blockchain, Inc. ("Riot" or the "Company") against certain of its officers and directors for breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted in hundreds of millions of dollars in damages to Riot's reputation, goodwill, and

standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Riot, formerly known as Bioptix, Inc. ("Bioptix"), was, until recently, engaged in the development and manufacture of diagnostic machinery and products for the biotech industry. In October 2017, the Company announced it was changing its name to "Riot Blockchain, Inc." and shifting its business focus to investing in and operating blockchain technologies.  For the remainder of 2017, the Individual Defendants (as defined herein) routinely touted the Company's increasing involvement in blockchain technologies, and brazenly represented that it was a seasoned player in this emerging technology.  The market reacted highly favorably to these representations and as the price of Bitcoin and other cryptocurrencies soared in November and December 2017, Riot's stock price steadily rose from $8.09 per share on October 3, 2017 to close at $38.60 per share on December 19, 2017, an increase of more than 377% in two months.

3.      Unfortunately, as would be slowly revealed by the Company starting in February 2018, Riot's apparent foray into "blockchain technology" was little more than a thinly veiled strategy to take advantage of the current cryptocurrency frenzy.    In fact, as the Individual Defendants were well aware, the Company lacked any meaningful underlying blockchain business plan and had only minimal investments in cryptocurrency products.

4.      The truth about Riot's business and operations began to emerge on February 16, 2018, when CNBC published an article on its website, titled "CNBC Investigates Public Company that Changed Its Name to Riot Blockchain and Saw Its Shares Rocket," revealing a number of questionable practices at the Company.  According to the article, the Company had no meaningful involvement in the cryptocurrency business, and its name changing stunt was likely to draw SEC scrutiny.  The article quoted SEC Chairman Jay Clayton as stating, "Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain."  The article further

detailed a number of red flags in the Company's SEC filings including, "annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and … evidence that a major shareholder was getting out while everyone else was getting in."

5.     On this news, shares of Riot stock plummeted more than 33%, from $17.20 per share on February 15, 2018 to $11.46 per share on February 16, 2018, instantly wiping out more than $66 million in market capitalization.

6.     Over the next several months, the Company's stock price continued to decline and has never recovered. The Individual Defendants' faithless actions and repeated improper statements have devastated Riot's credibility as reflected by the Company's $312 million, or 83%, market capitalization loss from a high of nearly $373 million in December 2017, to less than $61 million in September 2018.

7.     Defendants, however, did not fare nearly as poorly as the Company. Certain of the Individual Defendants have unlawfully reaped over $18 million in illegal insider trading proceeds of Company stock. In addition, during this time, certain Individual Defendants collectively pocketed millions of dollars in executive compensation and directors' fees not justified by Riot's actual performance while under their stewardship.

8.     As a direct result of this unlawful course of conduct, the Company is now the subject of an investigation by the SEC, as well as at least two federal securities class action lawsuits filed in the United States District Court for the District of New Jersey on behalf of investors who purchased Riot's shares (the "Securities Class Actions"). The Securities Class Actions bring claims against Riot and certain of the Individual Defendants in connection with the Company's improper statements, including causes of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

9.      Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

10.      Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

11.      This Court retains general jurisdiction over each named defendant pursuant to the Company's Bylaws that contains an exclusive forum bylaw provision for a court in the state of New York.  In particular, the provision states:

ARTICLE XIV FORUM SELECTION

Forum Selection:  Unless the Corporation consents in writing to the selection of an alternative forum, a state or federal court located within the State of New York shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim for breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders….

Additionally, this Court has specific jurisdiction over each named nonresident defendant because these defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Finally, exercising jurisdiction over any nonresident defendant is reasonable under these circumstances.

12.      Venue is proper in this Court because plaintiff is a resident of the Eastern District of New York, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Riot occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

13.     Plaintiff Louis Rotkowitz was a stockholder of Riot at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Riot stockholder.  Plaintiff is a citizen of New York.

**Nominal Defendant**

14.     Nominal defendant Riot is a Nevada corporation with principal executive offices located at 202 6th Street, Suite 401, Castle Rock, Colorado.  Accordingly, Riot is a citizen of Nevada and Colorado.  On October 19, 2017, the Company changed its name from Bioptix to Riot and reincorporated itself in Nevada from Colorado.  Prior to changing its name and reincorporating in Nevada, the Company's primary focus was the distribution of specialized medical equipment and obtaining regulatory approval for new drugs.  Following its October 2017 name change and reincorporation, Riot's business operations have principally consisted of building a cryptocurrency mining operation to generate cryptocurrency, primarily Bitcoin.  As of June 30, 2018, the Company owned approximately 8,000 specialized computers (also known as "miners") that generate cryptocurrency.  As of March 31, 2018, the Company had nine full-time employees.

**Defendants**

15.     Defendant John R. O'Rourke ("O'Rourke") was Riot's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") from November 2017 to September 2018; President from October 2017 to September 2018; and a director from January 2017 to September 2018.  Defendant O'Rourke is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant O'Rourke knowingly, recklessly, or with gross negligence:  (i) caused or allowed Riot to engage in a pump-and-dump scheme designed to enrich himself and defendant Barry Honig ("Honig") at the expense

of the Company; and (ii) made improper statements in the Company's press releases and public filings concerning the Company's: (a) cryptocurrency business, involvement with blockchain technologies, and investments in cryptocurrency products; (b) location of its executive offices; (c) intent to hold its Annual Meeting of Stockholders ("Annual Meeting") scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (d) woefully inadequate internal controls over financial reporting.  While in possession of material, nonpublic information concerning Riot's true business health, defendant O'Rourke sold 30,383 shares of his stock for $869,256.35 in proceeds. Riot paid defendant O'Rourke the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Total |
|------|--------|--------------|---------------|-------|
| 2017 | $60,000 | $2,322,000 | $609,842 | $2,991,842 |

Defendant O'Rourke is a citizen of Florida.

16.    Defendant Michael M. Beeghley ("Beeghley") was Riot's CEO from April 2017 to November 2017; Chairman of the Board from January 2017 to November 2017; and a director from November 2016 to November 2017.  Defendant Beeghley knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) cryptocurrency business, involvement with blockchain technologies, and investments in cryptocurrency products; (ii) location of its executive offices; (iii) intent to hold its Annual Meeting scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (iv) woefully inadequate internal controls over financial reporting.  Riot paid defendant Beeghley the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Total |
|------|--------|--------------|---------------|-------|
| 2017 | $9,000 | $270,000 | $60,739 | $339,739 |

Defendant Beeghley is a citizen of Georgia.

17.     Defendant Jeffrey G. McGonegal ("McGonegal") was a consultant to Riot from May 2018 to at least August 2018 and was also Riot's Principal Accounting Officer from June 2003 to April 2018; Chief Financial Officer from June 2003 to February 2018; Corporate Secretary from January 2010 to at least October 2017; and Interim President from December 2004 to January 2005.  Defendant McGonegal is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Defendant McGonegal knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) cryptocurrency business, involvement with blockchain technologies, and investments in cryptocurrency products; (ii) location of its executive offices; (iii) intent to hold its Annual Meeting scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (iv) woefully inadequate internal controls over financial reporting.  Riot paid defendant McGonegal the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2017 | $272,005 | $127,800 | $140,000 | $169,843 | $709,648 |

Defendant McGonegal is a citizen of Colorado.

18.     Defendant Honig was a Riot stockholder as recently as February 2018 and beneficially owned more than 5% of Riot's outstanding common stock from at least April 2016 to November 2017.  Defendant Honig also beneficially owned more than 10% of the Company's outstanding common stock from at least September 2016 to at least January 2017.  In December 2016, defendant Honig commenced a legal action against the Company seeking to compel a special meeting of the Company's stockholders to force the resignation of three of the Company's then directors.  In January 2017, the Company announced the resignation of the three directors whom defendant Honig sought to expel and the appointment of defendant O'Rourke and Mike Dai as directors.  Defendant Honig caused or allowed Riot to engage in a pump-and-dump scheme

designed to enrich himself and defendant O'Rourke at the expense of the Company.  While in possession of material, nonpublic information concerning Riot's true business health, defendant Honig sold 1,583,005 shares of his stock for $17,173,646.91 in proceeds.  Defendant Honig is a citizen of Florida.

19.     Defendant Andrew J. Kaplan ("Kaplan") is a Riot director and has been since May 2017.  Defendant Kaplan is also a member of Riot's Audit Committee and has been since May 2017.  Defendant Kaplan knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) cryptocurrency business, involvement with blockchain technologies, and investments in cryptocurrency products; (ii) location of its executive offices; (iii) intent to hold its Annual Meeting scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (iv) woefully inadequate internal controls over financial reporting.  Riot paid defendant Kaplan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2017 | $8,000 | $80,220 | $88,220 |

Defendant Kaplan is a citizen of New Jersey.

20.     Defendant Jason Les ("Les") is a Riot director and has been since November 2017.  Defendant Les is also a member of Riot's Audit Committee and has been since November 2017.  Defendant Les knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) cryptocurrency business, involvement with blockchain technologies, and investments in cryptocurrency products; (ii) location of its executive offices; (iii) intent to hold its Annual Meeting scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (iv) woefully inadequate internal controls over financial reporting.  Riot paid defendant Les the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2017 | $6,000 | $50,625 | $56,625 |

Defendant Les is a citizen of California.

21.     Defendant Eric So ("So") was a Riot director from October 2017 to February 2018. Defendant So was also the Chair of Riot's Audit Committee and a member of that committee from October 2017 to February 2018.  Defendant So knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) cryptocurrency business, involvement with blockchain technologies, and investments in cryptocurrency products; (ii) location of its executive offices; (iii) intent to hold its Annual Meeting scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (iv) woefully inadequate internal controls over financial reporting.  Riot paid defendant So the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2017 | $2,000 | $63,675 | $65,675 |

Defendant So is a citizen of Canada.

22.     The defendants identified in ¶¶15-17 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶15-16, 19-21 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶19-21 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶15, 18 are referred to herein as the "Insider Selling Defendants."   Collectively, the defendants identified in ¶¶15-21 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

23.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Riot and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Riot in a fair, just, honest, and equitable manner.  The Individual Defendants were

and are required to act in furtherance of the best interests of Riot and not in furtherance of their personal interest or benefit.

24.     To discharge their duties, the officers and directors of Riot were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Riot were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     refrain from engaging in acts of self-dealing to enrich themselves at the expense of the Company and its investors;

(e)     remain informed as to how Riot conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(f)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Riot's Corporate Governance Guidelines**

25. The Company's Corporate Governance Guidelines set forth the duties of the Board. Among other things, the Corporate Governance Guidelines provide that the directors are responsible for oversight of the Company's business and ensuring the Company's business is conducted with the highest standards of ethical conduct and in conformity with applicable laws and regulations. The Corporate Governance Guidelines state:

> The director's basic responsibility is to exercise his or her good faith business judgment in the best interests of the Company and its shareholders. In discharging these obligations, each director should be entitled to rely on the honesty and integrity of the Company's senior executives and its outside advisors and auditors absent evidence that makes such reliance unwarranted.

> Directors are expected to attend Board meetings and meetings of committees on which they serve, and to spend the time needed and meet as frequently as necessary to discharge properly their responsibilities. Information and data that are important to the Board's understanding of the business to be conducted at a Board or committee meeting should generally be distributed in writing to the directors before the meeting. Directors should review these materials in advance of the meeting and maintain the strict confidentiality of such information.

> Members of the Board shall be responsible for:
>
> • overseeing the conduct of the Company's business;
> • reviewing, and where appropriate, approving the Company's major financial objectives, plans, and actions;
> • ensuring the Company's business is conducted with the highest standards of ethical conduct and in conformity with applicable laws and regulations.

**Riot's Code of Ethics and Business Conduct**

26. The Company has adopted a Code of Ethics and Business Conduct (the "Code of Conduct"), which applies to all of the officers, directors, and employees of the Company. The stated purpose of the Code of Conduct is to, among other things, promote: (i) "[h]onest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest"; (ii) "[f]ull, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in [Riot's] other public

communications"; and (iii) "[c]ompliance with applicable governmental laws, rules and regulations."

27.     Among other things, the Code of Conduct mandates that the Individual Defendants' activities comply with the law.  Specifically, the Code of Conduct states:

2. Compliance with Law.

The Company and all Covered Persons should respect and comply with all of the applicable laws, rules and regulations of the United States and the other countries and state, local and other jurisdictions in which the Company conducts its business or in which the Company's stock is traded. The Company is subject to legal requirements that are both numerous and complex. All Covered Persons should understand those laws that apply to them in the performance of their jobs and take steps to ensure that the parts of the Company's operations with which they are involved are conducted in conformity with those laws. The failure of Covered Persons to adhere to the letter and the spirit of the law could result in both personal and corporate civil or criminal liability. Each Covered Person is personally responsible for complying with the law. In addition, each Covered Person is charged with the responsibility of reporting to the Compliance Officer (as defined in Section 8) any behavior or conduct related to the Company's business or affairs that could reasonably constitute a criminal offense. If a Covered Person has questions or any concerns about whether his or her conduct or the conduct of others may result in personal or criminal liability, the Covered Person should seek specific guidance and advice from the Compliance Officer or from counsel, which may include the Company's counsel.

28.     Further, the Code of Conduct specifically notes the importance of reporting financial information reasonably and accurately and maintaining appropriate internal controls and procedures to ensure that the Company's accounting and financial reporting complies with the law. The Code of Conduct states that "it is of critical importance that the Company's disclosures, including filings with the Securities and Exchange Commission, be accurate and timely."  With respect to the quality of Riot's public disclosure, the Code of Conduct states:

7. Public Reporting.

As a public company, it is of critical importance that the Company's public disclosures, including filings with the Securities and Exchange Commission, be accurate and timely. A Covered Person may be called upon to provide necessary information to assure that the Company's public disclosures are complete, fair and understandable. The Company expects Covered Persons to take this responsibility

very seriously and to provide prompt, accurate answers to inquiries related to the Company's public disclosure requirements.

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls.

In addition, each Covered Person must promptly bring to the attention of his or her supervisor or the Compliance Officer any information that the Covered Person may have concerning (i) significant deficiencies in the design or operation of internal control over financial reporting that could adversely affect the Company's ability to record, process, summarize and report financial data or (ii) any fraud, whether or not material, that involves management, directors, or other Covered Persons.

29.     The Code of Conduct also prohibits conflicts of interest and the using of corporate property, information, or position for personal gain.   Specifically, the Code of Conduct states:

3. Conflicts of Interest.

Conflicts of interest are prohibited as a matter of Company policy, except under guidelines approved by the Company's board of directors. A "conflict of interest" exists when a person's private interest interferes or conflicts, or appears to interfere or conflict, with the interests of the Company or the person's duties to the Company. Conflicts of interest may also arise when a person, or members of his or her family, receives improper personal benefits as a result of his or her position in the Company or takes an action or has a personal interest that may adversely influence his or her objectivity or the exercise of sound, ethical business judgment.

*   *   *

Covered Persons are also prohibited from (a) taking for themselves personally opportunities that properly belong to the Company or are discovered through the use of corporate property, information or position; (b) using corporate property, information or position for personal gain; and (c) competing with the Company. Covered Persons owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

30.     Lastly, the Code of Conduct explicitly prohibits insider trading.  With respect to insider trading, the Code of Conduct states:

• Prohibition on insider trading. U.S. Federal securities laws prohibit persons with access to or knowledge of material, non-public information about the Company from buying, selling, or otherwise trading in the Company's securities. In addition, the Company has adopted a Corporate Policy and Procedure on Insider Trading,

- 13 -

which prohibits trading in the Company's securities at certain times and under certain circumstances.

**Riot's Insider Trading Policy**

31.     In addition to the Code of Conduct, the Company maintains a separate Insider Trading Policy which "provides guidelines to employees, officers and directors of [Riot] with respect to trading in the Company's securities."  The "Policy applies to directors, officers, employees, consultants, and contractors of the Company and its subsidiaries, who receive or have access to Material Inside Information … regarding the Company," as well as any person who receives material inside information from an insider.  The Insider Trading Policy provides that inside information is material "if there is a reasonable likelihood that it would be considered important to an investor considering completing a Transaction in the Company's securities."

32.     The Insider Trading Policy explicitly forbids insiders from engaging in any transaction in the Company's securities while in possession of inside information.  The Insider Trading Policy also contains a "Black-out Period" "during which directors, executive officers, direct reports of directors and executive officers, and all employees of the finance department are prohibited from completing any Transactions."  The Insider Trading Policy states:

> **The trading window is closed beginning at 9 a.m. on the calendar day that is two (2) days before the end of each calendar quarter and reopens at 9 a.m. on the first (1st) calendar day after the Company filed the required SEC reports for that applicable quarter**.

*   *   *

> Even when the Trading Window is open, any person possessing Inside Information concerning the Company should not engage in any Transactions until such information has been known publicly for at least two Trading Days, whether or not the Company has recommended a suspension of trading to that person. Transactions in the Company's securities when the Trading Window is "open" should not be considered a "safe harbor," and all directors, executive officers and other persons should use good judgment at all times.

**Additional Duties of the Audit Committee Defendants**

33.     Under Riot Board's Audit Committee Charter, the Audit Committee Defendants, defendants Kaplan, Les, and So, owe and/or owed specific additional duties to Riot.  According to the Audit Committee Charter, among other things, the Audit Committee is responsible for assisting the Board in overseeing the integrity of the Company's financial statements, the Company's accounting and financial reporting processes, and internal controls over financial reporting.  In overseeing the Company's financial reporting processes on behalf of the Board, the Audit Committee is tasked with the following functions:

1. Review and discuss with the independent auditors the matters required to be discussed by the independent auditors under Auditing Standard No. 16, as adopted by the Public Company Accounting Oversight Board ("PCAOB") and amended from time to time, or any successor standard, rule or regulation.

2. Discuss with management and legal counsel the status of pending litigation, taxation matters, compliance policies and other areas that may materially impact the Company's financial statements or accounting policies.

3. Review with management and the independent auditors the effect of regulatory and accounting initiatives, as well as any off-balance sheet structures, on the Company's financial statements.

In overseeing the integrity of the Company's financial statements, the Audit Committee is required to:

1. Review and discuss with management and the independent auditors the Company's annual audited financial statements and quarterly financial statements (including disclosures under the section entitled Management's Discussion and Analysis of Financial Condition and Results of Operations and any report by the independent auditors related to the financial statements.

2. Based on the review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited consolidated financial statements in the Company's annual report on Form 10-K.

3. Review and discuss earnings press releases with management and the independent auditors.

4. Oversee the preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.

Lastly, in assisting the Board with oversight of the Company's internal controls and disclosure controls, the Audit Committee members are required to:

1. Review and discuss the adequacy and effectiveness of the Company's internal controls, including periodically receiving reports from the Company's independent auditors and Chief Executive Officer and Chief Financial Officer regarding the Company's system of internal controls.

2. Review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures, including periodically receiving reports from management regarding the Company's disclosure controls and procedures.

3. Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

**Breaches of Duties**

34.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Riot, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

35.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders, an unlawful practice that wasted Riot's assets, and caused the Company to incur substantial damage.

36.    The Audit Committee members had a duty to review the Company's earnings press releases and regulatory filings.  The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee Riot's public statements and internal control function.

37.    The Individual Defendants, because of their positions of control and authority as

officers and/or directors of Riot, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of defendants' improper course of conduct, the Company is now the subject of the Securities Class Actions that allege violations of federal securities laws. As a result, Riot has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Riot, as to the Company's operations, financial condition, and compliance policies; (ii) facilitate the Insider Selling Defendants' illicit sales of over $18 million of their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Riot and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

**BACKGROUND ON DEFENDANT HONIG'S CONTROL OF THE COMPANY**

44.     According to Riot's most recent Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K") filed with the SEC on April 17, 2018, the Company "is building a cryptocurrency mining operation, operating specialized computers (also known as "miners") that generate cryptocurrency (primarily Bitcoin)."  The 2017 Form 10-K further provides:  "In addition to mining, we are seeking to pursue our diversified blockchain and cryptocurrency focused strategy … through targeted investments in, and acquisitions of, businesses and assets within the blockchain ecosystem." Before October 2017, Riot was a

biotechnology company known as Bioptix that specialized in the development of veterinary and life science diagnostic tools.

45.     Since at least April 2016, defendant Honig has exercised immense influence over the Company's business and operations.  In April 2016, defendant Honig, directly or indirectly through his investment firm GRQ Consultants, Inc. ("GRQ Consultants") purchased over 335,000 shares of the Company—then named Venaxis, Inc. ("Venaxis").[1]  These shares represented roughly 8.65% of the Company's outstanding stock at the time.  In subsequent months, defendant Honig steadily increased the number of shares he owned in the Company.

46.     In September 2016, Venaxis acquired BiOptix Diagnostics, Inc.  Defendant Honig, an outspoken critic of the acquisition, called it an "inside job" and accused insiders of using the acquisition to entrench their interests.   Given defendant Honig's significant holdings in the Company, it was forced to issue a formal response.  Stephen Lundy ("Lundy"), the CEO of Venaxis at the time, issued a letter to stockholders in which he disputed defendant Honig's characterization of the transaction, but acknowledged defendant Honig's growing influence over the Company's affairs.  The letter stated:

> Since [Honig] became a significant shareholder in the spring of 2016, I have met with and spoken with him on many occasions and have been open to his thoughts and ideas.  When he determined that he wanted to propose a new slate of directors recently, I told him that any shareholder could, of course, follow the Board-approved process to propose Board candidates.  The Venaxis Nominating and Corporate Governance Committee is evaluating the candidates he has proposed.

47.     By December 2016, defendant Honig had acquired 500,000 shares of the Company (now named Bioptix).  Owning approximately 11.1% of the Company's outstanding shares, defendant Honig was the Company's largest stockholder.  That month, defendant Honig used his

---

[1] Bioptix was previously called Venaxis, but changed its name to Bioptix in December 2016 following a merger with a company named BiOptix Diagnostics, Inc.

significant ownership interest to nominate a slate of directors to the Board, including defendant O'Rourke.  Nominating materials filed on Form SC 14N with the SEC on December 2, 2016, described defendant O'Rourke as a managing member of ATG Capital LLC ("ATG"), an investment fund focused on small- and mid-cap growth companies, similar to defendant Honig's own firm, GRQ Consultants.

48.     Undisclosed was defendant Honig's long history of working and investing with defendant O'Rourke.  Defendants Honig and O'Rourke's history of investing together included other cryptocurrency investments.  For example, in 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS International ("WPCS"), a publicly traded company in which defendant Honig had also invested.  According to SEC filings, WPCS bought BTX Trader on December 17, 2013, only thirteen days after it was incorporated in Delaware.  At the time, WPCS was a communications, infrastructure, and contracting company.  After the purchase, WPCS stock went up to $435.60 on a split-adjusted basis, and now trades around $2 after it sold off BTX Trader in 2015.

49.     When defendant Honig's nominations were opposed by Company insiders, defendant Honig commenced legal action in Colorado state court to force a special meeting of stockholders in order to remove certain directors and implant his own nominees.  In response, the targeted directors resigned their positions, conceding defendant Honig's power and influence over the Company's affairs in their resignation letter to Lundy.  The resignation letter illustrates defendant Honig's control over the Board, stating:  "The members of the Board of the Company have engaged in discussions with principal shareholders of the Company subsequent to the commencement of such action, and, based on such discussions, have determined that if such special meeting were to be held, the proposals submitted by Mr. Honig would be approved by the shareholders."

50.     Following these resignations, the Company appointed defendant O'Rourke and Mike Dai, another of defendant Honig's nominees, to the Board.   These directors were also appointed to the Nominating and Governance, Audit, and Compensation Committees of the Board. As a result, defendant Honig-supported directors formed a majority on each committee.

51.     Defendant Honig's control over the Board and the Company's management continued to increase in subsequent months as additional non-Honig-supported directors resigned. In April 2017, Lundy resigned his positions as CEO and director and was replaced by defendant Beeghley, who was then serving as Board Chairman.   The stream of resignations further demonstrates defendant Honig's control over the Board.

52.     By August 21, 2017, defendant Honig effectively controlled the Company. Defendant Honig owned 543,000 shares of Bioptix, or roughly 10% of the Company's stock. Those related to defendant Honig also owned a number of shares in the Company:  (i) GRQ Consultants, defendant Honig's investment firm, owned 30,600 Bioptix shares; (ii) Alan Honig, defendant Honig's father, owned 20,000 shares of Bioptix; (iii) Titan Multi-Strategy Fund I, Ltd., an investment fund reportedly owned by Jonathan Honig, defendant Honig's brother, owned approximately 10% of the Company's shares; and (iv) Mark Groussman ("Groussman"), a reported business associate of defendant Honig, indirectly owned 500,000 shares of Bioptix through family accounts and his company, Melechdavid Inc.   Altogether, defendant Honig and his affiliates and family members owned approximately 30% of the Company.

**WITH DEFENDANT HONIG CONTROLLING THE BOARD, THE BOARD DECLARES A SPECIAL DIVIDEND DESPITE THE COMPANY EXPERIENCING CONTINUING AND SUBSTANTIAL LOSSES**

53.     On October 3, 2017, Bioptix announced that the Board had authorized a special cash dividend of approximately $1.00 per common share to be paid to the Company's stockholders

of record as of October 13, 2017.  The cash dividend was paid on October 18, 2017 and totaled approximately $9,562,000.

54.     The Board approved of this dividend despite the Company having an accumulated deficit of more than $120 million as of September 30, 2017, and cash and cash equivalents of only $13 million with no significant sources of revenue.  Furthermore, as the Company acknowledged in its Quarterly Report on Form 10-Q for the period ended September 30, 2017 (the "Q3 2017 Form 10-Q"), the Company's financial situation was unlikely to improve in the near-term.  The Q3 2017 Form 10-Q explained that, "[t]he Company has experienced recurring losses and negative cash flows from operations," and "expects to continue to incur losses from operations for the near-term" which could be significant.  The 2017 Form 10-K also described the Company's history of losses and identified a number of risk factors that could affect the Company's ability to continue as a going concern.   The 2017 Form 10-K stated:

**General Risks**

**We have a history of operating losses, and we may not be able to achieve or sustain profitability; we have recently shifted to an entirely new business and may not be successful in this new business.**

***We are not profitable and have incurred losses since our inception.  We expect to continue to incur losses for the foreseeable future, and these losses could increase as we continue to work to develop our business.  We were previously engaged in veterinary and life science-oriented businesses and were not successful in those businesses.***  In late 2017, we determined to instead pursue a blockchain and digital currency-related business, initially through investments in existing companies.  Our initial efforts in this new business will focus primarily on bitcoin mining and the establishment of a cryptocurrency exchange and a futures brokerage operation.  ***Currently, however, our only operations are at our bitcoin mining facility ("mine") in Oklahoma, and that mine is still in a relatively early stage of development.  Our current strategy is new and unproven, is in an industry that is itself new and evolving, and is subject to the risks discussed below.  This strategy, like our prior ones, may not be successful, and we may never become profitable.  Even if we achieve profitability in the future, we may not be able to sustain profitability in subsequent periods.***

**Our costs are growing rapidly, which could seriously harm our business or increase our losses.**

Our mining operations are costly, and we expect our expenses, including those related to acquisitions, to grow in the future.  This expense growth will continue as we broaden our network of computers to mine ("miners"), as we develop and implement an exchange feature, which will require more computing infrastructure, and as we hire additional employees to support potential future growth.  Our costs will be based on development growth of operations and may not be offset by a corresponding growth of our revenue.  We plan to continue to invest in our infrastructure to take advantage of various opportunities, potentially in countries and in activities where we do not expect significant short-term monetization, if any.  Our expenses may be greater than we anticipate, and our investments to make our business more efficient may not succeed and may outpace monetization efforts.  In addition, we expect to incur marketing and other operating expenses to grow and expand our operations and to remain competitive.  ***Increases in our costs without a corresponding increase in our revenue would increase our losses and could seriously harm our business and financial performance.***

\*   \*   \*

**We have an evolving business model.**

As cryptocurrency assets and blockchain technologies become more widely available, we expect the services and products associated with them to evolve.  In order to stay current with the industry, our business model may need to evolve as well.  From time to time, we may modify aspects of our business model relating to our product mix and service offerings.  We cannot offer any assurance that these or any other modifications will be successful or will not result in harm to our business.  We may not be able to manage growth effectively, which could damage our reputation, limit our growth and negatively affect our operating results.  ***Such circumstances could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations.***

\*   \*   \*

<u>**Cryptocurrency-Related Risks**</u>

**Regulatory changes or actions may alter the nature of an investment in us or restrict the use of cryptocurrencies in a manner that adversely affects our business, prospects or operations.**

As cryptocurrencies have grown in both popularity and market size, governments around the world have reacted differently to cryptocurrencies, with certain governments deeming them illegal, and others allowing their use and trade but, in some jurisdictions, such as in the U.S., subject to extensive, and in some cases overlapping, regulatory requirements, as well as unclear and evolving requirements.  ***Ongoing and future regulatory actions may impact our ability to continue to operate, and such actions could affect our ability to continue as a***

- 23 -

*going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations.*

**Our change in our business strategy and name could subject us to increased SEC scrutiny.**

We previously were engaged in veterinary- and life science-oriented businesses (as a diagnostics company and then a research tools company), under the name Bioptix.  In late 2017, we determined to instead pursue a blockchain and digital currency (specifically bitcoin)-related business, initially through investments in existing companies.  The SEC has announced that it is scrutinizing public companies that change their name or business model in a bid to capitalize upon the hype surrounding blockchain technology, and has suspended trading of certain of such companies.  *SEC Chairman Jay Clayton warned that it is not acceptable for companies without a meaningful track record in the sector to dabble in blockchain technology, change their name and immediately offer investors securities without providing adequate disclosures about the risks involved.  As a result, we could be subject to substantial SEC scrutiny that could require devotion of significant management and other resources and potentially have an adverse impact on the trading of our stock.*

\* \* \*

**Acceptance and/or widespread use of cryptocurrency is uncertain.**

Currently, there is a relatively limited use of any cryptocurrency in the retail and commercial marketplace, thus contributing to price volatility that could adversely affect an investment in our securities.  Banks and other established financial institutions may refuse to process funds for cryptocurrency transactions, process wire transfers to or from cryptocurrency exchanges, cryptocurrency-related companies or service providers, or maintain accounts for persons or entities transacting in cryptocurrency.  Conversely, a significant portion of cryptocurrency demand is generated by investors seeking a long-term store of value or speculators seeking to profit from the short- or long-term holding of the asset.  Price volatility undermines any cryptocurrency's role as a medium of exchange, as retailers are much less likely to accept it as a form of payment.  Market capitalization for a cryptocurrency as a medium of exchange and payment method may always be low.

The relative lack of acceptance of cryptocurrencies in the retail and commercial marketplace, or a reduction of such use, limits the ability of end users to use them to pay for goods and services.  Such lack of acceptance or decline in acceptances could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of bitcoin or any other cryptocurrencies we mine or otherwise acquire or hold for our own account.

\* \* \*

**We face risks from the lack of clarity in the corporate governance of many cryptocurrency systems**.

Lack of clarity in the corporate governance of many cryptocurrency systems may lead to ineffective decision making that slows development or prevents a network from overcoming important obstacles.  Governance of many cryptocurrency systems is by voluntary consensus and open competition.  To the extent lack of clarity in corporate governance of cryptocurrency systems leads to ineffective decision making that slows development and growth, the value of our securities may be adversely affected.

55.    Given the Company's financial state, the dividend was clearly excessive.  The special dividend only further depleted the Company's dwindling cash reserves and impaired its ability to pursue new business ventures.  As the Individual Defendants must have known, the following day, October 4, 2017, the Company would be changing its name to Riot, and shifting its business focus to investing in blockchain technologies.  Such a pursuit that would undoubtedly require significant capital expenditures from Riot.  Nonetheless, the Individual Defendants approved of the special dividend, draining the little cash the Company had.

56.    Moreover, the dividend was not grounded on any reasonable business objective.  Rather, the cash dividend was a mere ploy for defendant Honig to loot the Company before cashing out his investment.  As for the Company providing a rationale, in the October 3, 2017 press release defendant Beeghley merely stated:  "This special dividend is a positive step to return value to all Bioptix shareholders."  The return of value to stockholders was particularly true for defendant Honig and his associates who collectively received millions of dollars as a result of the special dividend.

**THE INDIVIDUAL DEFENDANTS REPEATEDLY TOUT THE COMPANY'S BLOCKCHAIN BUSINESS, ARTIFICALLY INFLATING RIOT'S STOCK PRICE, THEN DUMP THEIR RIOT STOCK BEFORE THE SCHEME UNRAVELS**

57.    As detailed below, the Individual Defendants made repeated improper statements about the Company's business, operations, and prospects.  Specifically, the Company's fiduciaries touted the Company's increasing involvement in blockchain investments and routinely represented

- 25 -

that the Company was "leverag[ing] its expertise and network" and was positioned to be a "leading authority" on blockchain technologies in a "rapidly growing blockchain ecosystem." Unfortunately, these representations were woefully inaccurate.  In truth, the Individual Defendants were engaged in a pump-and-dump scheme designed to manipulate the true value of the Company's stock and enrich themselves at the expense of the Company's reputation and financial well-being.

### A.    The Company Changes Its Name And Touts Its Blockchain Investments

58.    On October 4, 2017, Bioptix issued a press release announcing that it was changing its name to Riot and shifting its business focus to investing in and operating blockchain technologies, with a particular focus on Bitcoin and Ethereum.  Despite the Company having no previous business in blockchain technologies, the press release touted Riot's expertise in the industry, stating:

> Riot Blockchain Inc. (formerly Bioptix, Inc.) leverages its expertise and network to build and support blockchain technology companies. It is establishing an Advisory Board with technical experience intending to become a leading authority and supporter of blockchain and provides investment exposure to the rapidly growing blockchain ecosystem.

59.    Defendant Beeghley, the Company's then CEO, assured investors that Riot had "the insight and network to effectively grow and develop blockchain assets."  In fact, as the press release highlighted, Riot had already made a strategic investment in goNumerical Ltd. d/b/a Coinsquare ("Coinsquare"), "one of Canada's leading exchanges for trading digital currencies." The press release stated that this investment was "indicative of similar opportunities Riot Blockchain plans to pursue."

60.    The following day, on October 5, 2017, the Company filed a Current Report on Form 8-K with the SEC, attaching an "Investor Presentation" as an exhibit thereto.  The presentation explained that the cryptocurrency market had experienced tremendous growth in

2017, with its market value increasing from $17.7 billion to $150 billion during the year, and portrayed Riot as "part of the disruptive technology and activities revolutionizing transactions." According to the Investor Presentation, Riot was "[a]s first mover as [a] NASDAQ listed pure play Blockchain company."   The presentation repeated defendant Beeghley's quote that, "At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies.   We provide investment exposure to the rapidly growing blockchain ecosystem."

61.      Roughly two weeks later, on October 17, 2017, the Company issued a press release announcing that it had entered into a definitive purchase agreement to acquire a 52% ownership interest in Tess Inc. ("Tess"), an Ontario, Canada-based company focused on developing blockchain-based payment services for wholesale telecom carriers.   The press release expressed the Company's "commit[ment] to building and supporting the blockchain ecosystem."   The press release quoted defendant Beeghley as stating:  "The telecom payment platform of TESS is a prime example of how blockchain-based technologies can be leveraged to disrupt established industries. I believe that Riot Blockchain is poised to take advantage of this revolution in digital transactions as we see increasing adoption of blockchain protocols in our everyday lives."

62.      On October 27, 2017, the Company filed a Current Report on Form 8-K attaching an updated "Investor Presentation" as an exhibit thereto.   The updated presentation discussed Riot's then recent business acquisitions and revised upwards the estimated size of the Company's cryptocurrency market opportunity from $150 billion to $170 billion.   The Investor Presentation portrayed Riot as "one of the only publicly traded blockchain companies listed on NASDAQ."

63.      On November 2, 2017, the Company issued a press release announcing that it had entered into a definitive agreement to acquire cryptocurrency mining equipment.   The press release quoted defendant O'Rourke as stating:  "The acquisition positions us to launch our cryptocurrency

mining operations, at a time that Bitcoin and other digital currencies are gaining increased attention and adoption....  We plan to leverage the mining technology to help realize our vision of becoming a leader in blockchain technologies.  Mining bitcoin helps secure the bitcoin blockchain, while providing us direct exposure to accumulating bitcoin in the process."

64.     On November 13, 2017, the Company filed its Q3 2017 Form 10-Q with the SEC. The Q3 2017 Form 10-Q stated that Riot's principal executive offices remained at Castle Rock, Colorado.  It also portrayed the Company as a legitimate blockchain business that allowed investors to seek exposure to rapidly rising cryptocurrency markets, but without the risks of being exposed to any one particular cryptocurrency.  The Q3 2017 Form 10-Q explained that the success of the Company, the Company's share price, and the significant investor interest were a "result of the Company's early emergence as a publicly traded company in which holders of appreciated cryptocurrency have an opportunity to invest inflated cryptocurrency profits for shares of the Company."  Lastly, the Q3 2017 Form 10-Q assured investors that cryptocurrency holders had "realized exponential value" and investors could "lock in" that price appreciation by purchasing Riot stock.  The Q3 2017 Form 10-Q stated:

> In addition, the success of the Company, the Company's share price, and the interest in investors and the public in the Company *as an early entrant into the blockchain and cryptocurrency ecosystem may in large part be the result of the Company's early emergence as a publicly traded company in which holders of appreciated cryptocurrency have an opportunity to invest inflated cryptocurrency profits for shares of the Company, which could be perceived as a way to maintaining investing exposure to the blockchain and cryptocurrency markets without exposing the investor to the risk in a particular cryptocurrency. Cryptocurrency holders have realized exponential value due to large increases in the prices of cryptocurrencies and may seek to lock in cryptocurrency appreciation, which investing in the Company's securities may be perceived as a way to achieve that result, but may [] not continue in the future.* As a result, the value of the Company's securities, and the value of cryptocurrencies generally may be more likely to fluctuate due to changing investor confidence in future appreciation (or depreciation) in market prices, profits from related or unrelated investments or holdings of cryptocurrency.  Such factors or events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, or on the price of the Company's securities, which would have

a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

65.     The Q3 2017 Form 10-Q contained certifications by defendants O'Rourke and McGonegal pursuant to sections 302 and 906 of the Sarbanes-Oxley Act of 2002 that the Q3 2017 Form 10-Q contained no untrue statement of material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Q3 2017 Form 10-Q.

66.     On November 16, 2017, the Company issued a press release announcing its investment in Verady, LLC, a provider of accounting, audit, and verification services for cryptocurrencies.  The press release explained that the "investment in Verady will be used to further advance its technology and increase the size of its team."  Defendant O'Rourke is quoted in the press release highlighting the Company's "commitment to building blockchain technologies" and the "significant market potential for blockchain and digital asset technologies."

**B.     The Company Reschedules Its Annual Meeting**

67.     On December 12, 2017, the Company filed its Proxy Statement on Form DEF 14A with the SEC, announcing the date of its Annual Meeting.  According to the filing, the Annual Meeting would be held on December 28, 2017, at the Boca Raton Resort and Club, 501 East Camino Real, Boca Raton, Florida.

68.     Roughly two weeks later, on December 27, 2017, the Company issued a press release announcing the cancellation of the Annual Meeting scheduled for the following day. According to the press release, the Annual Meeting "was adjourned to achieve a quorum on the proposals to be approved," and would be rescheduled to February 1, 2018.  In reality, as would later be revealed, the Company never intended to hold its Annual Meeting in neither December 2017 nor February 2018.

69.     On this news, Riot's stock fell from $31.22 per share on December 26, 2017, to close at $27.23 per share on December 28, 2017, erasing over $38 million in market capitalization in two days.

**C.     Riot Insiders Sell Their Personally Held Stock Before the Truth Emerges**

70.     Then, on December 29, 2017, the Company filed a Form 4 with the SEC disclosing that defendant O'Rourke had sold 19,583 shares of personally held Riot stock at $28.48 per share and an additional 10,800 shares indirectly owned through ATG at $28.90 per share.  This represented approximately 37% of Riot shares held by defendant O'Rourke and ATG and netted gross proceeds of nearly $870,000.

71.     The Form 4 provided the market with the first indication that the Individual Defendants' repeated growth projections might not have been as rosy as previously touted.  On this news, Riot's stock fell more than 14% between December 29, 2017 and January 3, 2018, from $28.40 per share to $24.36 per share, respectively.

72.     On January 5, 2018, the Company filed a Current Report on Form 8-K, disclosing that it had dismissed its auditor, EisnerAmper LLP.  A January 9, 2018 article by *Seeking Alpha* titled "Riot Blockchain:  This Crypto Clown Car Continues Hurtling Toward the Abyss," publicized the auditor's dismissal and noted with skepticism that Riot had three different auditors within the span of a year, which raised concerns about corporate governance and the legitimacy of the Company's business.  On this news, Riot's stock fell nearly 15% between January 5, 2018 and January 11, 2018, from $24.43 per share to $20.85 per share, respectively.

73.     On February 13, 2018, defendant Honig reported that his share ownership had fallen to roughly 173,000 shares, or less than 1.5% of the Company's outstanding shares as of January 4, 2018.  Also on February 13, 2018, Jonathan Honig, the brother of defendant Honig, reported that his share count had fallen to roughly 201,000, or 1.7%, of shares outstanding as of

January 4, 2018.  Then, only days later, on February 15, 2018, Groussman reported that he owned only approximately 189,000 Riot shares, or about 1.62% of the Company's outstanding shares as of December 31, 2017.  These three stockholders, who once collectively owned nearly 30% of the Company's common stock, suspiciously sold at the exact time the Company's share price was at or near all-time highs, mere days before the Individual Defendants' scheme was revealed.

## REASONS THE STATEMENTS WERE IMPROPER

74.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    the Company changed its name from Bioptix to Riot merely to take advantage of the current cryptocurrency wave and artificially inflate its stock price;

(b)    the Company lacked any meaningful business plan with respect to the cryptocurrency business;

(c)    Riot had only limited investments in cryptocurrency products;

(d)    Riot's principal executive offices were located in Florida, where defendant Honig was also located and exercised undue influence over the Company's management;

(e)    Riot never intended to hold its Annual Meeting scheduled for December 28, 2017 and rescheduled for February 1, 2018;

(f)    the Company lacked adequate financial and internal controls; and

(g)    as a result of the foregoing, representations concerning the Company's operations, financials, and business prospects were improper.

## THE TRUTH ABOUT THE INDIVIDUAL DEFENDANTS' PUMP-AND-DUMP SCHEME EMERGES

75.    The truth about Riot's business practices emerged on February 16, 2018, when CNBC published on its website an investigative report detailing a number of questionable practices

at the Company. The article, titled "CNBC Investigates Public Company that Changed Its Name to Riot Blockchain and Saw Its Shares Rocket," first expressed skepticism over the Company's abrupt name change and apparent foray into the blockchain business. The article quoted SEC Chairman Jay Clayton cautioning companies about improperly attempting to take advantage of the hype surrounding blockchain by "chang[ing] your name to something that involves blockchain when you have no real underlying blockchain business plan." The article stated:

> As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.
>
> **But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease**.
>
> That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.
>
> **"Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.**
>
> The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.

76.     The article noted several other red flags at Riot, and raised concerns about overpriced equipment purchases, postponed Annual Meetings, insider selling, and dilutive stock issuances on favorable terms, among other things. The article stated:

> That purchase and the company's name change aren't Riot's only questionable moves.
>
> **A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in**.

\* \* \*

*Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida.* The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

*But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.*

77.     The article further revealed that defendant Honig effectively controlled the

Company, describing him as "the man behind the Riot Blockchain curtain."  The article stated:

Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.

*That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.*

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right

places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

78.     In addition, the article revealed red flags relating to defendant Honig's long-standing business and personal relationship with defendant O'Rourke, which raised concerns about the exchange of information between the CEO and the Company's major investor.   The article stated:

> From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.
>
> \*   \*   \*
>
> **When CNBC crew members walked into the office, they didn't find Honig, they found [CEO of Riot, defendant O'Rourke]**. That's the same O'Rourke who made headlines when – less than three months after the company changed names and business plans – he sold about $869,000 worth of shares, according to an SEC filing. He told the crew he was there for a meeting with Honig and that we had just missed him.
>
> O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.
>
> He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.
>
> "I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."
>
> "John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office … at one time John O'Rourke had space in my office … we speak often."
>
> **Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information**.
>
> "**You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in**

*the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP*.

Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.

"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

"*I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said. "And what I understand [is] a significant amount of insider selling. So yes, these are red flags*."

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

79.      As additional questionable practices, the article cited a suspiciously timed dividend payout of $9.5 million as well as reporting failures by defendant Honig in connection with his ownership interest in the Company:

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent.  After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's

investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28. At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

*   *   *

**_Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock. Or has the potential to own [a] significant amount of stock in excess of what is reported on the 13D," he said_**.

This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.

"The answer's no," Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

80.     The article also discussed Riot's recent cryptocurrency investments and revealed

that Riot had significantly overpaid for bitcoin mining machines from a less-than-two-week-old

entity that had several ties to Company insiders.  The article stated:

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. SEC filings are silent on mining activity.

As for professional poker players advising Riot? O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers. He called them "thought leaders."

81.     The article also explained that "Riot is not O'Rourke and Honig's first cryptocurrency investment" and detailed one of their previous ventures into blockchain.   The article stated:

### Riot is not O'Rourke and Honig's first cryptocurrency investment.

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. "I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."

Honig acknowledges the investment.

82.     Lastly, the article concluded by noting that a number of questions remain for Riot.

The article stated:

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

"You see companies adjourn meetings in a context of a contested election and the like," Birns said. "I just don't think in this instance, there's any reason to adjourn their annual meeting."

And as to O'Rourke selling stock in December?

He told CNBC in the email: "I sold less than 10 percent of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell stock to cover such tax obligations. I could have sold more stock in that window but chose to sell just 30,383 shares."

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype," he said. "Riot is all for increased transparency and properly imposed regulation."

Honig would not disclose how much he made on his investment in Riot, "I wasn't fortunate enough to do as well as you might think and people might speculate. ...I don't regret anything."

83.     On this news, shares of Riot stock plummeted more than 33%, from $17.20 per share on February 15, 2018 to $11.46 per share on February 16, 2018, wiping out more than $66 million in market capitalization in a single day.  In addition, after the truth about Riot's business practices hit the market, investors filed the Securities Class Actions against Riot alleging violations of federal securities laws.

84.     On April 17, 2018, the Company filed its 2017 Form 10-K disclosing that it had received a subpoena from the SEC on April 9, 2018, "requesting certain information from the Company."  On this news, shares of Riot stock fell another 5%, from $7.30 per share on April 17, 2018 to $6.87 per share on April 18, 2018, wiping out more than $5.7 million in market capitalization.

85.     The following month, in its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018, filed with the SEC on May 17, 2018, the Company provided further information on the SEC investigation.  The Form 10-Q stated that the SEC inquiry concerned the "proper asset classification, applicability of the Investment Company Act [of] 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency."  With regard to the status of the investigation, the Company merely stated that it was "ongoing."  The Form 10-Q stated:

> On April 9, 2018, the Company received a subpoena requesting documents from the U.S. Securities and Exchange Commission pursuant to a formal order of investigation.
>
> As part of its ongoing review of the Company's SEC filings, the Company has received and responded to comments from the staff of the SEC regarding certain developments and the Company's ongoing development of a blockchain/cryptocurrency business model.  These inquires include the proper asset classification, applicability of the Investment Company Act or 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency. The resolution of these matters is ongoing and has been described in more detail under "Risk Factors" in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017.

## A COMPLAINT FILED BY THE SEC REVEALS DEFENDANTS HONIG'S AND O'ROURKE'S OTHER PUMP-AND-DUMP SCHEMES

86.     On September 7, 2018, the SEC filed a complaint in the U.S. District Court for the Southern District of New York against ten individuals and their associated entities, including defendants Honig and O'Rourke, as well as Groussman and GRQ Consultants in connection with a number of pump-and-dump schemes. The SEC complaint revealed that defendants Honig and O'Rourke had perpetrated at least three pump-and-dump schemes in the past using the same entities and individuals as they used to improperly profit from Riot.  According to the SEC complaint, defendant Honig "was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."  The SEC complaint explained:

> …In each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company. In every scheme, Honig, and some combination of [John] Stetson, [Michael] Brauser, O'Rourke, Groussman and [Phillip] Frost, either explicitly or tacitly agreed to buy, hold or sell their shares in coordination with one another, knowing that a pump and dump was in the offing that would allow them all to profit handsomely. Once Honig and his associates had secured substantial ownership of the issuer, they acted as an undisclosed control group, directing the issuer's management for their benefit, including orchestrating transactions designed to create market interest in the company or to solidify their control.

> To profit from their investment, in each scheme, Honig and his associates would arrange and pay for the promotion of the stock, directing their co-defendant [John] Ford, or a similar promoter, to write favorable and materially misleading articles about the company whose stock price they wanted to inflate. In several instances, to magnify the intended boost to volume and price that would follow a promotional article's release, Honig, Brauser, O'Rourke, Groussman, Melechdavid and ATG engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock, priming investor interest.

While defendants Honig and O'Rourke and their associates received millions of dollars from these schemes, public investors were left holding virtually worthless stock.

87.     One scheme, described in the SEC complaint as the "Company A scheme," involved a Delaware corporation headquartered in Georgia.  In the Company A scheme, defendant Honig and his associates acquired a large quantity of Company A stock at steep discounts by acquiring a publicly traded shell company and executing a reverse merger of Company A Labs into the shell company.  Between March 2011 and December 2013, defendant Honig and two of his associates, Phillip Frost ("Frost") and Michael Brauser ("Brauser") controlled the vast majority of Company A's stock.  In addition, defendant Honig, Frost, and Brauser exercised control over Company A's management.  Elliot Maza, the CEO of Company A, sought approval from Honig and Brauser for every business decision.  As Brian Keller, one of Company A's three board members explained in a February 12, 2012 e-mail to a Company A colleague, "[t]he real power is with Barry Honig and Mike Brauser.  Elliot [Maza] is just a mouth piece."  Company A's board of directors, however, concealed defendant Honig and Brauser's control of Company A by signing off on public filings that failed to disclose their involvement.

88.     By September 2013, defendant Honig and his associates, including defendant O'Rourke, had collectively amassed 44,818,312 shares, or almost 71% of the Company A shares outstanding, and were ready to sell.  The market, however, was virtually nonexistent, with zero volume on September 20, 2013.  To pump up the value of Company A's stock, defendant O'Rourke paid John H. Ford, a seasoned stock promoter, to write a favorable article about Company A and its apparently rosy research and development prospects.  The article was published before the market closed on September 26, 2013, and the market reacted highly favorably.  The trading volume of Company A stock rose from roughly 1,100 shares on September 25, 2013, to over 4.5 million shares on September 27, 2013, and the average share price more than doubled from August 2013 to October 2013. Defendant Honig and his associates then dumped their personal stock, receiving proceeds of approximately $9,260,000.

89.     The SEC complaint details two other pump-and-dump schemes perpetrated by defendant Honig and his partners.  In these schemes, defendant Honig and his partners employed many of the same tactics they used in the Company A scheme:  they bought cheap shares, intending to exercise control over the management and policies of the company; exercised the control; orchestrated a misleading promotion of the company that drove up the stock price and the trading volume of the company's shares; and dumped their shares for a profit in the market.  In addition, like with the Company A scheme, defendant Honig and his associates, including defendant O'Rourke, took a number of steps to conceal their involvement, and to create the false appearance that the companies were actually being controlled by their respective CEO.

90.     After the SEC filed its complaint, shares of Riot stock fell more than 24%, from $5.68 per share on September 6, 2018 to $4.30 per share on September 7, 2018, wiping out nearly $20 million in market capitalization.

### INSIDER SALES BY DEFENDANTS HONIG AND O'ROURKE

91.     Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Riot's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As insiders of Riot, these defendants were privy to material, nonpublic information about the Company's true business health.

92.     While in possession of this knowledge, defendant Honig sold 1,583,005 shares of his personally held Riot stock for proceeds of $17,173,646.91.  Defendant Honig's sales were timed to maximize profit from the Individual Defendants' overall scheme to artificially inflate Riot's stock price.  In the five months prior to October 4, 2017, defendant Honig sold 13.76% of his stock.  Following the improper statements made on October 3, 2017, the Company's stock price steadily rose from a low of $8.09 per share to a close of $38.60 per share on December 19, 2017, representing a 377% increase, before beginning to fall in January 2018.  Further, defendant Honig's

sales are suspicious given that his stock sales represented 98% of his holdings as demonstrated by the table below:

| Honig, Barry | |
| --- | --- |
| Total Shares Before Sales | 439,893 |
| Shares Sold During SP | 1,583,005 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 1,609,727 |
| Shares Remaining SP | 26,722 |
| Total Proceeds from Sales | $17,173,646.91 |
| % of Total Ownership Sold During SP | 98.34% |

93.     While in possession of this knowledge, defendant O'Rourke sold 30,383 shares of his personally held Riot stock for proceeds of $869,256.35.  Defendant O'Rourke's sales were timed to maximize profit from the Individual Defendants' overall scheme to artificially inflate Riot's stock price.  Following the improper statements made on October 3, 2017, the Company's stock price steadily rose from a low of $8.09 per share to a close of $38.60 per share on December 19, 2017, representing a 377% increase, before beginning to fall in January 2018.  While defendant O'Rourke had not sold any stock prior to October 4, 2017, after the Company's stock skyrocketed and only days before it began to fall, defendant O'Rourke sold nearly 30% of his holdings as demonstrated by the table below:

| O'Rourke, John | |
| --- | --- |
| Former Chief Executive Officer, Chairman of the Board, Director | |
| Total Shares Before Sales | 42,050 |
| Shares Sold During SP | 30,383 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 102,550 |
| Shares Remaining SP | 72,167 |
| Total Proceeds from Sales | $869,256.35 |
| % of Total Ownership Sold During SP | 29.63% |

94.     In sum, defendants O'Rourke and Honig sold over $18 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| O'ROURKE | 12/29/2017 | 19,583 | $28.45 | $557,136.35 |
| Former Chief Executive Officer & Chairman | 12/29/2017 | 10,800 | $28.90 | $312,120.00 |
| | | 30,383 | Total (Sales) | $869,256.35 |
| | | 0 | Total (Other) | $0.00 |
| | | 30,383 | Total Proceeds | $869,256.35 |
| | | | | |
| HONIG | 10/4/2017 | 47,520 | $8.92 | $423,878.40 |
| Beneficial Owner | 10/5/2017 | 11,400 | $7.47 | $85,158.00 |
| | 10/6/2017 | 10,000 | $7.29 | $72,900.00 |
| | 10/9/2017 | 136,028 | $8.62 | $1,172,561.36 |
| | 10/10/2017 | 55,459 | $9.32 | $516,877.88 |
| | 10/10/2017 | 11,070 | $8.43 | $93,320.10 |
| | 10/11/2017 | 130,000 | $10.10 | $1,313,000.00 |
| | 10/11/2017 | 128,916 | $10.00 | $1,289,160.00 |
| | 10/11/2017 | 35,000 | $10.00 | $350,000.00 |
| | 10/12/2017 | 26,600 | $8.25 | $219,450.00 |
| | 10/12/2017 | 15,000 | $8.44 | $126,600.00 |
| | 10/17/2017 | 4,000 | $8.47 | $33,880.00 |
| | 10/18/2017 | 3,088 | $7.68 | $23,715.84 |
| | 10/19/2017 | 3,700 | $8.17 | $30,229.00 |
| | 10/20/2017 | 45,000 | $8.20 | $369,000.00 |
| | 11/7/2017 | 3,800 | $8.42 | $31,996.00 |
| | 11/9/2017 | 800 | $7.75 | $6,200.00 |
| | 11/10/2017 | 3,972 | $7.25 | $28,797.00 |
| | 11/13/2017 | 9,500 | $7.25 | $68,875.00 |
| | 11/14/2017 | 1,032 | $7.20 | $7,430.40 |
| | 11/14/2017 | 3,968 | $7.10 | $28,172.80 |
| | 11/15/2017 | 5,268 | $7.64 | $40,247.52 |
| | 11/16/2017 | 61,000 | $8.31 | $506,910.00 |
| | 11/17/2017 | 18,588 | $8.81 | $163,760.28 |
| | 11/20/2017 | 262,293 | $10.48 | $2,748,830.64 |
| | 11/21/2017 | 143,475 | $12.85 | $1,843,653.75 |
| | 11/24/2017 | 10,000 | $11.77 | $117,700.00 |
| | 11/24/2017 | 64,235 | $11.77 | $756,045.95 |
| | 11/24/2017 | 64,235 | $11.77 | $756,045.95 |
| | 11/24/2017 | 64,235 | $11.77 | $756,045.95 |
| | 11/24/2017 | 64,236 | $14.19 | $911,508.84 |
| | 11/28/2017 | 27,907 | $16.61 | $463,535.27 |
| | 11/28/2017 | 1,500 | $16.64 | $24,960.00 |
| | 11/28/2017 | 58,593 | $16.64 | $974,987.52 |
| | 11/29/2017 | 36,587 | $16.94 | $619,783.78 |
| | 11/29/2017 | 9,248 | $13.29 | $122,905.92 |
| | 11/30/2017 | 5,752 | $13.13 | $75,523.76 |
| | | 1,583,005 | Total (Sales) | $17,173,646.91 |
| | | 0 | Total (Other) | $0.00 |

| | | 1,583,005 | **Total Proceeds** | **$17,173,646.91** |
|---|---|---|---|---|
| | | | | |
| | | 1,613,388 | **Total (Sales)** | **$18,042,903.26** |
| | | | **Total (Other)** | **$0.00** |
| | | 1,613,388 | **Total Proceeds** | **$18,042,903.26** |

### DAMAGES TO RIOT

95.      As a result of the Individual Defendants' improprieties, Riot disseminated improper, public statements concerning the Company's business, operations, financials, and disclosure controls and procedures.  These improper statements have devastated Riot's credibility as reflected by the Company's staggering $310 million, or 83%, market capitalization loss from its December 2017 high to the present.

96.      Riot's improper statements also severely damaged its reputation within the business community and in the capital markets.  In addition to price, Riot's current and potential investors consider a company's trustworthiness, stability, and ability to accurately value its business prospects and evaluate growth potential.  Investors are less likely to invest in companies that disseminate improper statements, fail to comply with their own internal protocols and external regulations, and are uncertain about their own business practices and financial prospects.  Accordingly, Riot's ability to attract investors is now impaired.  In addition, Riot's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

97.      Further, as a direct and proximate result of the Individual Defendants' actions, Riot has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the Securities Class Actions for violations of federal securities laws;

(b)    costs incurred in complying with the investigation by the SEC;

(c)    costs incurred to investigate wrongdoing; and

(d)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Riot.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

98.    Plaintiff brings this action derivatively in the right and for the benefit of Riot to redress injuries suffered, and to be suffered, by Riot as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Riot is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99.    Plaintiff will adequately and fairly represent the interests of Riot in enforcing and prosecuting its rights.

100.    Plaintiff was a stockholder of Riot at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Riot stockholder.

101.    The current Board of Riot consists of the following three individuals: defendants Kaplan and Les, and nondefendant Remo Mancini ("Mancini").  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Kaplan and Les Face a Substantial Likelihood of Liability for Their Misconduct**

102.    As alleged above, defendants Kaplan and Les breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding: (i) the extent of Riot's investments in cryptocurrency products and involvement with blockchain

technologies; (ii) the location of the Company's principal executive offices; (iii) the Company's intention to hold its Annual Meeting scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (iv) the adequacy of the Company's internal controls over financial reporting.  These statements were improper because they knowingly or recklessly misstated and/or omitted material, adverse facts concerning the Company's financial performance and condition, as well as the effectiveness of the Company's internal controls and disclosure controls and procedures.

103.    The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  As alleged above, two of the three current Board members, including Director Defendants Kaplan and Les face a substantial likelihood of liability for repeatedly failing to comply with this duty. Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

104.    In addition, defendants Kaplan and Les, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.   Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.   Thus, defendants Kaplan and Les face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

105.     Any suit by the current directors of Riot to remedy these wrongs would expose defendants O'Rourke and McGonegal and nominal defendant Riot to liability for violations of the federal securities laws in the pending consolidated Securities Class Actions, and would result in civil actions being filed against one or more of the other Individual Defendants.  The Securities Class Actions allege violations of sections 10(b) and 20(a) of the Exchange Act.  If the Board elects for the Company to press forward with its right of action against defendants O'Rourke and McGonegal in this action, then Riot's efforts would compromise its defense of the Securities Class Actions.  Accordingly, demand on the Board is excused.

**Demand on Defendant Kaplan Is Futile for Additional Reasons**

106.     Director Defendant Kaplan is incapable of impartially considering a demand to commence and vigorously prosecute this action due to his long-standing, overlapping business relationships with defendants O'Rourke, Honig, and Beeghley.  Defendants Kaplan, Honig, and O'Rourke, and Beeghley are very active in the business community, which has created many entangling relationships.  In particular:

(a)     Director Defendants Kaplan, Honig, and Beeghley all served on the board of directors of Majesco Entertainment Company ("Majesco"), a Delaware corporation focused on developing, marketing, publishing, and distributing interactive entertainment.  Defendants Kaplan and Honig were Majesco directors from September 2015 until December 2016 and defendant Beeghley was a Majesco director from December 2015 until January 2017.  During this time defendant Honig also served as the CEO of Majesco as well as Co-Chairman of Majesco's board of directors.  Furthermore, defendants Honig and O'Rourke concurrently invested in Majesco from at least May 2015 to at least August 2016.  As of August 2016, defendant Honig owned 31% of Majesco.

(b)      Director Defendant Kaplan also serves on the board of directors of U.S. Gold Corp., another corporation in which defendant Honig owned a significant stake.  U.S. Gold Corp., formerly known as Datram Corporation, changed its name to U.S. Gold Corp. effective June 26, 2017 and became a gold and precious metals exploration company.  None of U.S. Gold Corp.'s properties contain proven probable reserves, and all of its activities are exploratory in nature. Defendant Kaplan has served as a director of U.S. Gold Corp. since November 2017 and defendant Honig owned a significant amount of stock in the company since at least October 2015.

107.      These overlapping directorships and long-standing business relationships raise a reason to doubt that defendant Kaplan would vote to initiate litigation against defendants Honig, O'Rourke, and Beeghley.  Furthermore, there is a reasonable doubt that defendant Kaplan would vote to initiate litigation against defendant Honig due to the sense of owingness he feels for the substantial rewards he reaped from defendant Honig, and because it would likely prevent him from being presented with future opportunities to serve on the boards of companies controlled by defendant Honig. As a result of these long-standing and extensive professional entanglements, defendant Kaplan is incapable of impartially considering a demand to commence and vigorously prosecute this action.  Demand is therefore futile as to defendant Kaplan.

108.      Plaintiff has not made any demand on the other stockholders of Riot to institute this action since such a demand would be a futile and useless act for at least the following reasons:

(a)      Riot is a publicly held company with over fourteen million shares outstanding and thousands of stockholders as of August 8, 2018;

(b)      making demand on such a large number of stockholders would be impossible for plaintiff, who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)      making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

109.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.     The Individual Defendants owed and owe Riot fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Riot the highest obligation of good faith, fair dealing, loyalty, and due care.

111.     The Individual Defendants and each of them, violated and breached their fiduciary duties of care and loyalty.

112.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company lacked any meaningful business plan with respect to the cryptocurrency business; (ii) Riot had only limited investments in cryptocurrency products; (iii) the Company changed its name from Bioptix to Riot merely to take advantage of the current cryptocurrency wave and artificially inflate its stock price; (iv) Riot's principal executive offices were located in Florida, where defendant Honig was also located and exercised undue influence over the Company's management; (v) Riot never intended to hold its Annual Meeting scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (vi) the Company failed to maintain adequate internal controls.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

113.    The Director Defendants, as directors of the Company, owed and owe Riot the highest duty of loyalty.  These defendants breached their duty of loyalty by causing or allowing defendants to make improper statements in the Company's press releases and public filings concerning the Company's blockchain operations, location, Annual Meeting, and relationships with Company insiders.  The Director Defendants knew or were reckless in not knowing that: (i) the Company lacked any meaningful business plan with respect to the cryptocurrency business; (ii) Riot had only limited investments in cryptocurrency products; (iii) the Company changed its name from Bioptix to Riot merely to take advantage of the current cryptocurrency wave and artificially inflate its stock price; (iv) Riot's principal executive offices were located in Florida, where defendant Honig was also located and exercised undue influence over the Company's management; (v) Riot never intended to hold its Annual Meeting scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (vi) the Company failed to maintain adequate internal controls.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

114.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

115.    The Insider Selling Defendants breached their duties of loyalty by selling Riot stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was proprietary, nonpublic information concerning the Company's future business prospects.  It was a proprietary

asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Riot common stock.

116.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Riot has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

117.    Plaintiff, on behalf of Riot, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Actions that they brought on with their improper statements.

120.    In addition, as a result of the decision to allow the Company to operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused Riot to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

121.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

122.    Plaintiff, on behalf of Riot, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

123.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

124.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Riot.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Riot.

125.     The Insider Selling Defendants sold Riot stock while in possession of material, adverse nonpublic information that artificially inflated the price of Riot stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material inside information.

126.     Plaintiff, as a stockholder and representative of Riot, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

127.     Plaintiff, on behalf of Riot, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Riot, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Ordering defendants to convene and hold Riot's Annual Meeting of Stockholders no later than sixty days from the date of this Court's Order and designating the time and place of the Annual Meeting, as well as the form and timing of notice to be provided to Riot's stockholders;

C.     Directing Riot to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Riot and its

stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

       1.     a proposal to strengthen the Company's controls over financial reporting;

       2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

       3.     a proposal to strengthen Riot's oversight of its disclosure procedures;

       4.     a provision to control insider selling; and

       5.     a provision to permit the stockholders of Riot to nominate at least three candidates for election to the Board;

D.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Riot has an effective remedy;

E.     Awarding to Riot restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

F.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: October 9, 2018                        LAW OFFICE OF THOMAS G. AMON

                                              THOMAS G. AMON

                                              733 3rd Avenue, 15th Floor
                                              New York, NY 10017
                                              Telephone: (212) 810-2430
                                              E-mail: tamon@amonlaw.com

                                              ROBBINS ARROYO LLP
                                              BRIAN J. ROBBINS
                                              CRAIG W. SMITH
                                              STEVEN R. WEDEKING
                                              600 B Street, Suite 1900
                                              San Diego, CA 92101
                                              Telephone: (619) 525-3990
                                              Facsimile:  (619) 525-3991
                                              E-mail: brobbins@robbinsarroyo.com
                                                      csmith@robbinsarroyo.com
                                                      swedeking@robbinsarroyo.com

                                              Attorneys for Plaintiff

1283032

## VERIFICATION

I, Louis Rotkowitz, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____1 Oct. 2018_____

_____
LOUIS ROTKOWITZ